Good morning. Don Christensen on behalf of Appellant Brent Coss. On the afternoon of July 26, 2005, Officer Coss responded to a call of a threat of bodily harm and domestic dispute situation. He responded with other officers and they conducted a reasonable investigation. They interviewed the only two individuals who were witnesses to the crime. When they spoke with the victim, she provided sufficiently detailed information to establish the probable cause that the crime of harassment had occurred and that Mr. Wheeler had committed it. When they interviewed Mr. Wheeler, he corroborated certain essential facts. Now, the victim also showed the officers her application for a temporary protective order and told them that an order had been issued and served on Mr. Wheeler that same afternoon. She didn't have a copy of the order there, so the officers did everything they could reasonably to attempt to determine whether an order had been issued and served on Mr. Wheeler. They contacted their records division to determine whether an order had been issued. They determined from the records division that they had no record yet, but under Nevada law, no order was required to be registered until within 24 hours had expired after the order was issued. The problem is that the authority requires that you actually look at the order. Justice Sark, I assume you're referring to the Beer case. In Beer, it was a very different situation. Number one, in that situation, the order was there in the same room as the officers were. They just chose not to look at it. In Beer, in footnote nine, the court there expressly left open the sort of situation that we have in this case. They left open the question of whether under exigent circumstances, whether it would be reasonable for an officer or could an officer reasonably believe he had probable cause to arrest even without looking at the order under exigent circumstances. That's exactly what we had here. I have a hard time seeing how that would work. If the requirement is before you arrest somebody, because that's a serious thing when you arrest somebody, that you actually look and see if there is a protection order or not, and what that order says. So if you can't see the order at all, it seems to me you don't have a basis for arrest. Well, the Beer court left that open under exigent circumstances, which is what we have here. In Beer, there were no exigent circumstances. Well, this is something that troubles me. Do we really have exigent circumstances here? The usual situation of one of these domestic violence situations is it's at the house, and they're both there. He voluntarily went to the police station and wanted to have kind of a peace trip home so that he could collect some of his belongings. So there was no pressure at that time on anyone to make an arrest. They could have investigated a lot of things and asked him more questions. So this, to me, ordinarily I'm very sympathetic to these domestic violence situations to prevent, if there's any, real chance of violence, arrest and get him out of there. But this isn't quite that situation. Well, I guess I'd have to respectfully disagree. What Wheeler told the officers was that he just wanted, or said in his declaration, that he just wanted the police to accompany him home. He had no intention of leaving the home. After the police took him home, then they were going to leave. They were going to sit and, I mean, they couldn't just sit there with them and see if anything happened. He had, according to the victim, Brown, he had threatened her on the phone. He was angry. They were arguing about financial matters, other things. He had motivation to be angry. What was the actual threat? That I'm coming, I'm coming home to deal with you. I'm going to come home and deal with you. Was that a threat for bodily injury? Yes, I think it could be. You look at all the circumstances, which is what the cases say you need to do. You can't just listen to the words themselves. You put them in the circumstances. The circumstances they had conveyed that it supported the conclusion that a threat had been made. Was there any past record of having domestic violence that he'd actually used bodily injury? No. He had, there had been an incident where he'd smashed the daughter's stereo, which showed what happened when he loses his temper, that he can lose control. But there had not been that. But, but. Quite a bit of difference, though. I understand. But you can't just refrain, an officer out there in the field when he's confronted with this sort of situation can't make a decision on whether there's been any past violence or not, because when somebody does something violent, they when they do it for the first time, they do it for the first time without a record. And he can't go by whether there's a record necessarily. If you have probable cause for arrest, it seems like it's more than that. You took somebody out there that wanted to be accompanied to go out there. So he wasn't going to be violating anything. And so you arrest him. Well, that's what he says in his declaration. Now, Mr. Wheeler does. But I mean, you can look at this from the officer's officer's perspective, too, isn't that which we said this in our reply brief. But after you've done the act, isn't it sort of a perfect cover in some ways? If you want to look at it in one way, at least that. Oh, I'm going to call the police now to try to help myself cover him up and say I wanted a peaceful visit. But he's already committed the crime. Can you convey the threat? Can you help me and put the events in sort of time sequence? Was the first contact to law enforcement from Mrs. Wheeler? Yes. Miss Brown. She calls up and said he's he's called and he said he's coming home to take care of it or take care of me. And and she asked she didn't want to remain in the home. Correct. She took off with both of her children. She got the kids and asked the police officers to meet her at the mall. Is that right? Yes. Well, she didn't ask them to meet at the mall. She left and then came back to the house. And when in this sequence did the husband call and ask for this company visit? After the officers had already responded to the house where the where the wife, the victim is, the police officers had searched the house to make sure Mr. Wheeler wasn't there, interviewed her. Then a call came in. I don't think we have a time in the record. But it was sometime after that that the police received the call. And I'm sorry if I don't have these in the right sequence. She left the house with the children. Right. And went to a neutral side, if you will. Did the officers meet her there and take her back with them? No. Somehow they got her on the phone and told that told her that they were now at the house. And they went to the mall and they couldn't find her. Might be right. When it's clear from the record that when they took the husband to the house, they were going to leave him there. They never took him. They didn't take him back to the house. They arrested him at the at the substation where he called from or where he'd gone to. All right. I think just very briefly, save the rest of my time for rebuttal. But paying PNG is the case. I believe the controls here. What it sets out is that what it says is the Ninth Circuit said and paying is where is here. The victim alleges that force or threat of force existed. It's important for officers to err on the side of safety for the victim in order to prevent further violence and allow the parties to cool down. PNG specifically recognized the volatility of the domestic dispute sort of situation. It's our view that officer cost did exactly what the Ninth Circuit and PNG told them he should do in this sort of a situation where he has conflicting facts. I'd like to reserve the OK, just under two minutes. Thank you for your argument. We'll hear from the other side at this time. Good morning. Good morning. I'm Terry Kaiser Cooper. I represent Robert Wheeler. The harassment charge was predicated on the existence of a TPO. In the absence of a TPO, you only have the wife's subjective statement that she was in fear. There were no words used that would reasonably cause her that fear, and there was no prior acts of violence ever. A reasonable police officer would know that vague, unspecific words like, I'll deal with you, with no reference to violence in the context of no TPO. So if you smash up your child's stereo, to me that's a pretty violent act and shows that someone at least has a violent temper. Your Honor, the court records, there was testimony about the stereo. The records, and I believe it's SER 48, the daughter wouldn't turn down the volume. He pulled the cord from the stereo because she wouldn't turn it down, and he dropped it. That is the sole testimony. The wife never saw it, and he went out and replaced the stereo the next day. It was an accident, and that's what the court records said. It was when they went to family court and a TPO was denied, that stereo was the only example of his violence in the six years that they'd been married. That was it. It was an accident. Doesn't the common law cases tell us that context of a threat is manifestly important? You're sure right, Your Honor, it does. And all of the cases cited by the defendants involve facially innocuous words like, I'll see you later, in the context of physical violence. The guys have been threatening to kill the wife. I was reading an article the other day about someone was trying to explain the way New Yorkers talk, and the article describes someone walking up to a house and saying, nice house you have there, shame if anything happened to it. Would that be a threat? You look at the context. If the guy had been going there every day, surveilling it, and threatening the occupants, you bet, Your Honor. But here, we have no other words used. Tony Soprano shows up at your front door and he looks at your brownstone and says, nice house you have there, shame if anything happened to it. That's not a threat? If you know that Tony Soprano is a violent person, certainly. But the cases cited by the defendants, they involve these facially innocuous words with a threat of violence in the past, with prior abuse in the past, with beatings in the past, with threats to kill them. Nothing like that here, Your Honor. How long had they been married? Five years. Okay. Second marriage for both. Don't you think she understood his thinking and when he meant business and when he didn't? Absolutely not, Your Honor. He had never struck her, never threatened to strike her. She testified on the record repeatedly. He had never hit her, never hit her children. Do I understand correctly, she had taken his paycheck and put it in her account? She did that all the time, yes. And he wasn't happy with that? People who are married are often not happy with the way others do finances. Let me ask you this. If the officer had probable cause to arrest your client for the threat, I understand you don't think it's a threat, but if he had probable cause to arrest him for the threat, does the other situation fall away? Do we need to even address the other situation? The TPO? Yeah. Well, the TPO, no reasonable officer in the universe would think there's a TPO when someone gives them the papers. I need to repeat my question. I'm sorry. My question is if the officer had probable cause to arrest your client based on what was reported to him as a threat, do we need to visit the second issue or the other issue, and that's the TPC? No, no. So if we conclude that there was probable cause to arrest, that's the end of it? Your Honor, under this U.S. Supreme Court, that is. Counsel, how much can we rely on the officer's perception of the woman's fear? She didn't even want to go back into the house until it was searched. She left with her children so that certainly she was expressing real fear, and how much can the officer rely on that? Well, I think it's important, Your Honor. However, a reasonable officer would not rely solely on the wife's appearing frighten, but would look at are there facts to justify the fear. A reasonable officer would have said, has this guy ever hit you before? Has he threatened you before? Has he hit anyone before? Does he have any history of violence? That's what the officer needs to do to understand whether or not a perception of fear, rather than just wanting to get someone in trouble. The officer testified he didn't. It didn't sound like she was trying to get someone in trouble. It sounds like she outwardly was expressing genuine fear. Well, she probably appeared to be in fear, Your Honor. However, she had called his employment the week before. She had called other people before. This is a very angry woman. We don't expect the officer to know that. But what we do expect is the officer to look at was that fear reasonable, to ask minimal questions. He didn't know either party, never seen them. And to address your question about Mr. Wheeler, about the sequence of events, Mr. Wheeler, at the end of the call, his wife threatened him. She had kicked him before in a very private place that hurt. And we supplied in the supplemental excerpts of record the doctor's visit. She kicked him in the balls. That's what she did. And he was afraid of her. She outweighed him by almost 100 pounds. After their call, she said, don't come home or there will be trouble. So that's why he called the police. He wanted a safe escort home. A reasonable officer would know the intent of Mr. Wheeler in asking for a safe escort home was not to cause violence or harm, but the opposite, to avoid it. The house was in his name. Did he tell the officers that he was in fear? Yes. He told her what had happened. He told the officers the conversation. That's why he went there. He said, I had a conversation with my wife, and she threatened me on the telephone, and I would like a safe escort home. He was planning, this was his house, bought with his separate funds. This was a second marriage for both. He had a TPO application that he put against her first. On July 19th, he went and independently sought a TPO against her because of her violence. Then he, when she got wind of that, when it was served on her, then she filed for her own TPO application. No orders were granted. In Nevada, as in most states, when a TPO is granted, the victim gets the TPO and they're told to keep it on their person. She gave the officer her TPO papers. A reasonable officer would have looked at it. There were a pile of papers. They would have seen, as on all TPOs, what the declaration is about what had occurred. And he would have seen there was no reference to any past violence ever. This was a bookkeeper guy. A reasonable officer would not rely on the wife's appearance of fear. You've got to have reasonable facts. And as you said, Your Honor, that the context, if Mr. Wheeler was involved in crime, was Tony Soprano, and had been threatening her regularly, a whole different context. But none of that is present here. There is not one threat in the past, one act of violence in the past. The stereo incident was an accident. Now, Pang v. Pang, let me just real briefly address that. Pang v. Pang establishes two requirements for probable cause to arrest for a crime in a domestic setting. The first requirement is the victim's statements must be sufficiently specific to establish the elements. And in Pang, it was a robbery situation, a brother and a sister. The brother had forcefully grabbed land documents, ownership documents, away from the sister and took off. The sister called the police and gave a detailed, very specific explanation of what happened. It satisfied all the elements of robbery. The second requirement is there had to be cooperation. And in Pang, two independent witnesses said, hey, I saw the whole thing. I saw the guy come up and grab the papers. Here we have a whole different situation. Here we have no specific words of violence, no past violence. I'll deal with you when I get home. It has nothing to do with violence. It's very vague. Was he on supervised release at this time? No. He was on probation. He was a bank vice president and eight years earlier had pled to a small embezzlement. He had made restitution and he was serving his last year of probation. So he was on probation. He was on probation for embezzlement. Could that have been why he wanted the police escort? He never mentioned that to me, Your Honor. He wanted it because she had kicked him before and she had hurt him. And I can find very quickly in the excerpts of records, the medical records. He didn't want any trouble. This is the last thing he wanted. He wanted safety. His acting going to the police substation shows an intent to avoid harm and violence, not to cause it. Okay. As I understand it, he contests her statement that I will deal with you. He says that's not really what she said, but for purposes of summary judgment, we'll take it as being what she said. Right. What he actually said was we'll look into reconciling the account and find out where the money went. We moved for summary judgment. And so in moving, we didn't want a factual dispute. So we said, okay, we'll go with that because we think those words are sufficiently vague and unspecific that a reasonable officer would not find those words threatening in the context of no prior history whatsoever. Okay. You're well over your time. Thank you for your argument. I'm so sorry. Okay. Rebuttal. In the short time remaining, I'd just like to address the probable cause on the harassment issue. What the magistrate judge found were two reasons for denying qualified immunity on that prong with respect to the harassment issue, the harassment charge. The magistrate judge found that the words were not sufficient to convey a threat. We've cited a number of cases in our opening brief in which words that were far less threatening in and of themselves were found sufficient not just to establish probable cause, but were found sufficient to be sufficient, be able to sustain a conviction. In some of those cases, individuals were sentenced to substantial prison terms. So I'd refer you to those cases. You put it into context, as the panel understands, and that's what Officer Cost did here. The second reason that the magistrate judge denied the qualified immunity on the first prong with harassment is he believes that the officers didn't conduct a sufficient investigation under the Arpin case. Arpin involved an extremely different situation. The allegations in that case, which were decided on a motion to dismiss, were that the arresting officers never even gave the alleged perpetrator and subsequent plaintiff an opportunity to give her side of the story. That's what the allegations were. And the court here said that that's not a sufficient independent investigation. You have to reasonably investigate. Here the officers interviewed the only two witnesses there were to the threat, Wheeler and Ms. Brown. Arpin also did not involve exigent circumstances such as are presented here. Arpin occurred, it was a battery that had already occurred, and people were reporting it. None of the cases, in fact, involving reasonable investigation involved exigent circumstances like this case does. This case should be controlled by the principles in Ping. That's what Officer Cost followed, and that's what we'd ask the court to apply here. Thank you over your time. But I am curious as to what you consider the harassment. What was that? Was he harassed? Harassment under the Nevada under Nevada law, the court and Nevada law is that you have to convey a threat of bodily harm with the victim place and reasonable fear that the threat would be carried out. That's what the charge is. So and so what was the harassment under that standard? That was that the words that were used. I'm going to come. I'm coming home to deal with you. Conveyed a threat of bodily harm and that it reasonably placed the victim in reasonable fear that that threat would be carried out. It does not require a specific method to carry it out, whether it's weapons or something else. It's just a generalized and just the intent to convey the threat that that violence will be incurred. It's not doesn't have to actually intend to actually do it. Just convey the threat. OK. Just just to the Ninth Circuit. You know, I believe I'm not. But nothing further. OK. Thank you. Thank you for your argument. Thank you. Thank both sides for their arguments. The case just argued would be submitted for decision.
judges: Hug, Fletcher B. , Hawkins